Good morning, your honors. It may please the court. My name is Michael Pearson. I represent the appellant in this matter, Jorge Rojas. And as a preparatory matter, I'd also like to reserve five minutes and I'll also try to watch the clock this morning. The background of this case impacts the public interest. Mr. Rojas was an air traffic control student who applied to become employed by the FAA taking a biometric or biographic test in 2015. He failed that test and asked the FAA to provide underlying validation data to show that that test was in fact related to his qualifications to become an air traffic controller. Mr. Rojas was finishing an aviation degree. He was a commercial pilot. He had substantial aviation background and he wanted to know why he and thousands of other similarly situated individuals did not meet the basic qualifications to become a controller, so he filed an FOA request with the FAA. The issues before the court, I believe, are the scope of the request. Was it properly determined by the district court that the scope was limited to summaries or included the validation documents? The adequacy of search issue. The government's burden to show that they did a reasonable search based upon the request. And whether the docs were an interagency memorandum. The district court held that they were interagency memorandums and that the private contractor, APT Metrics, who worked with the government to design and validate the test were a government agency. That the work product privilege applied to the summaries and that Mr. Rojas had not met his burden regarding the adequacy of search issue. The first issue I think that subsumes and really relates and is dispositive of this case is the scope of the request. In relevant part, Mr. Rojas' request stated, I am requesting information regarding the empirical validation of the biographical assessment noted in the rejection notice. This information includes any report created by, given to, or regarding APT Metrics evaluation and creation and scoring of the assessment. The words I think to be focused on in that is the second sentence stated includes. Includes is not a limiting word. It's an additive word. In this case, it's much like the Lacedra case that was a DC circuit case that's already been decided. Of course, it doesn't apply to this circuit. But the plain wording of that would require the FAA to do an adequate search for the validation study that they told Mr. Rojas that they had undertook in his rejection notice. And that members of the FAA have testified, and I don't think the government disputes, that alleged validation study occurred. In response to Mr. Rojas' request, he got nine pages or was told there was nine pages of summary documents. And that was all there was. Well, in a way, it's nonsensical. It doesn't make sense. How can you summarize something unless there's underlying data to summarize? So let me ask you a question that I think goes to what you're arguing. Are there material facts that support the argument you're making that the FAA failed to conduct a search that was reasonably calculated to uncover all the relevant documents? And if so, why did you agree that summary judgment was appropriate in the district court? Well, I don't believe we agreed summary judgment was appropriate in the district court based on the adequacy of the search issue. We were discussing the summaries, Your Honor. I do believe that they did provide for the district court review the summaries. I don't believe that they provided nor has the district court held whether the exemptions apply to the underlying validation studies. Counsel, on that point, forgive me for interrupting, but on that point, is there an obligation for them to go get the underlying data if it's still sitting with their consultant? Oh, I believe there is. They can't use... Do you have authority for that? Well, they can't use the... I have practical authority, and I do believe I cited the law in the brief, Your Honor. Okay. Let me first address... Sure, sure. And then I'll hop right on your point because I do think it's very important. The declarations were simply not sufficient under the LAR v. NTSB case and many other cases. The declarations the FAA gave were by a Mr. John Scott for APT Metrics and a Yvette Armstrong, an actual FAA employee. Mr. Scott worked for the outside company. For declarations to be sufficient to show that the search was adequate, the law requires that you state the actual procedures used, the staff members contacted, the files and e-mails examined, the time spent on the various searches, and the number of documents or pages sent in response to the request. If you just review the declarations themselves, you see they're conclusory and very self-serving. They don't go to any of those points. To the point, ma'am, would you restate it one more time? Well, I just think Judge Molloy and I are probably trying to get at the same thing, really, which is as to the scope of this search. And I'm trying to figure out whether your problem is you think they didn't search widely enough within the FAA? Because you've answered the summaries question and then you're looking for the underlying data. And my question was, do they have an obligation to go get it from a consultant if they've outsourced the study? I believe they do. And I don't believe this circuit has ‑‑ when I said before, I believe there's authority. It was a Leukage case versus FBI. It's a Third Circuit case that we cited, specifically discussing the consultant corollary, which the FAA is using to shield these documents. And, by the way, the Sixth Circuit rejected. And it also kind of ties into the Klamath case, although the United States Supreme Court didn't reach the ultimate issue there. The consultant corollary basically states that an outside contractor can be treated the same as an FAA employee. Right. So here's my problem. If that's the case, and I think that's probably likely, otherwise it would be awfully easy to evade a FOIA request. And, really, FAA doesn't have the expertise to do this kind of human factors analysis or, well, this isn't human factors. But, you know, it's easy to imagine many examples where this type of study would be outsourced. But your briefing kind of does two things. One is it talks about the scope of the search. And even if I give you all of what you're arguing about, yes, they have an obligation to go get it from their contractors and whatnot, don't you still run right into the work product problem? I don't believe so. Their argument is, yes, we had this study done, and we had it done in anticipation of litigation. Well, the Ritchie case actually speaks to that. That's a very good point. Actually, documents that are normally prepared in the ordinary course of business, as validation studies historically are, not only by the Code of Federal Regulations, the statute or, excuse me, the regulation we cited, but also by industry practice, the International Society of Organizational Psychologists require this. And the FAA has done it in the past. And, by the way, the FAA does have the expertise and has done this in the past. They have what's called the Civil Aeronautical Medical Institute. But that's not what's done here. That's not what was done here. And I was just trying to give you a hypothetical example, so I don't want to derail you. Sure. So it's a hypothetical where they've outsourced this. And you've got this. You're trying to convince us this was done in the ordinary course of business, and their response is, we had been threatened with suit, and so this is a work product privilege. And I would really appreciate your response to that. Well, first of all, the timing doesn't work. The validation studies prior to a test being issued have to be done prior to legally issuing the test. So if you just look at the timeline, that is incorrect. Also, the threat of litigation was not regarding this issue at all. The only threat of litigation the FAA had at this point was basically purging a list of 2,600 students that had graduated from CTI programs, had the merit-based certification required, were standing in line to be hired by the FAA. In December of 2013, the FAA made an abrupt change, purged that list of those 2,600 students, both genders and certainly many races from college campuses who started diversity, by the way. That list was purged. They were then told they had to stand in line and take this biographical assessment. The biographical assessment, the studies to show that it was valid despite industry standard and past FAA practice where they did reveal the underlying validation studies, peer review is a necessary part of showing that the test, in effect, was just and it was designed to be fair. And the FAA used APT metrics. The reason that it doesn't apply, the reason the consultant corollary certainly should not apply is threefold. Number one, it's not within the statute itself. The corollary consultant where APT metrics gets a shield of a government contractor defense isn't here. It's not like a Federal Tort Claims Act case. It doesn't comport with FOIA transparency, specifically after the amended FOIA law where the government meant to increase transparency, not reduce it, and congressional intent. And it's bad public policy to encourage offshoring of critical documents like this, public documents to private contractors. This simply would allow federal agencies to take documents that should be revealed, such as aptitude tests that have to be peer reviewed and should be peer reviewed, send it out to an outside contractor, and then allege that this exemption applies. I want to make sure you're not arguing that the government is prevented from telling the folks who were standing in line, to use your terminology, that they needed to take this new biometrics test. I don't think that's your argument. That's not the case before the Court today, ma'am. Right. Okay. So I just want to be clear about that. Correct. And it's fine for them to outsource, whether they have the expertise or not. It's fine for them to outsource easy-to-imagine circumstances where they wouldn't have the expertise. But be that as it may, so that's not your argument either. That's not my argument. You think they had an obligation, though, to go to sweep in what has been outsourced, and I think that you have a strong argument that otherwise that would be run contrary to FOIA. But doesn't that still get you back to work product? And I think your response to work product is you think the chronology doesn't line up. Am I understanding your argument correctly? Yes, Your Honor. It's absolutely much more articulate than me. Basically, the validation study has to be done prior, a proper validation study prior to the test being put out for public use to screen people for employment. Well, but was it done prior to ñ it seems the critical point is whether or not it was prepared in anticipation of litigation. Are you arguing that they hadn't been threatened with suit yet? They were threatened with suit for a different matter, the purging of the list, not the matter of the underlying validation. Not this biometric test. Yes, Your Honor, that's correct. And even more important, they had an independent duty based upon the CFRs, the Code of Federal Regulations, I cited, the EEOC rule regarding these biometric tests to, in fact, validate it prior to putting it out for public use. Now, the FAs admitted that. Ricky Cannon, a high-level second-in-command of HR at the FAA, admitted that. And also, the industry society that basically organizational psychologists that design these biometric tools state that. Sunshine is good. They need peer review to make sure it was done correctly so people aren't being disenfranchised. The lawsuit concerning the 2,600 people, had they taken the same biological assessment or was it newly going ñ I mean, where were they in the process? It was new. It was new up until 2013, December of 2013. I see I'm running out of time. Up until December of 2013 ñ You can answer the question. You actually have two and a half minutes anyway. Thank you. They had a peer-reviewed test called the ATSAT that the FAA had published results, continually published, developed internal to the FAA by the Civil Aeronautical Medical Institute. And it was very well received, and it was used to screen air traffic control applicants. Each one of these students had taken that ATSAT, had passed the CTI test, and had obtained a recommendation from the faculty of those schools, many or most of which were ex-air traffic controllers, that this person has the qualities and aptitude to become an air traffic controller. In 2014, early January 8th of 2014, the colleges were notified that the FAA was going to purge the list. And in that testimony or statement to the colleges, they said there is a peer-reviewed, basically, assessment that everybody is going to be forced to take. That was early 2014. Mr. Rojas didn't take that one. He hadn't graduated yet. He took the 2015 one, which was the subsequent test. So that's the timeline. I've got one short question for you. Why is the transcript of the June 15th, 2016, congressional hearing relevant so as to merit judicial notice here? What's it got to do with the case? Well, Ricky Cannon stated, who was the number two of the HR in the transcript, that, in fact, the FAA had a responsibility and duty to validate that test, and it was validated. If you go further down the transcript, the head of the union said, no, it was not. And that's the issue. We're trying to find out if it was validated or not. And in the past, the FAA has been very forthcoming as industry standard and the statute requires, excuse me, the regulation requires, in publishing this data. It shines light on it. It lets people know of all races and both genders that this thing was designed correctly and allows people with professional competence and expertise to look at that and make an outside determination. In this matter, the FAA, for the first time in their history, is hiding that data. Can I just ask, so it seemed to me, though, that the documents requested by your client went also, in addition to this assessment and validation study, went also to the reason specific to him for his inability to pass that test. Did you get any of those documents? No, Your Honor. Are they on the Vaughn Index? I don't believe so. I don't have that in front of me. I looked at it and I couldn't find. All Mr. Rojas received was that letter. And that's all any student receives is a letter saying, you didn't pass. And to pass, they would give a numeric grade. They would give more information. That's why these, not only Mr. Rojas, but this is a public interest, because people are saying, what did I do wrong? Why didn't I pass? I had the background and the expertise to do this. And that's why these questions are here, and that's why we're asking that the government be transparent. And if, in fact, it was a validated study done appropriately, you'd think it would be published on billboards throughout the country, not hidden. And I see that I only have 30 seconds left, so I would like to, in case there's an argument, come preserve that time, unless there's another question from the panel. Thank you, counsel. Thank you very much. Good morning, Your Honors. May it please the Court. I'm Assistant United States Attorney Alarise Medrano, on behalf of the defendant, Appelli, Federal Aviation Administration. I think the context of this FOIA request is important. This was initially a broader FOIA request for a series of types of information. I believe there were initially three. It was narrowed down during the administrative process. In addition, it was centrally received at FAA and farmed out to the components of FAA where they believed those documents might be found. There were four of them. And three of the subcomponents who responded are not at issue in this case. Their responses are not at issue in this case. Counsel and I had agreed to that. So there was a response with additional documents that are not those before the Court here. The focus of this case was always about the records that were retrieved from AGC 100, which is a notation for not just general counsel's office, but the labor division of the general counsel's office at headquarters in Washington, D.C. This is a small office, ten attorneys in the office. So when a request was made for records, it was very simple to go to the approximately four attorneys that were currently working on the litigation and this issue about the certification of the test, the biographical assessment test, and ask them to go through their files. These were attorneys that were familiar with what the FOIA would require of them and knew exactly where to look, as opposed to a typical FOIA case that your honors might see where we have someone doing an electronic search of thousands of records. This was very focused. And so that search was the issue in the district court. However, we did stipulate at some point we don't need to go to a settlement conference. We told the district court judge that because we've talked about this and we've agreed that the nine pages that were found by AGC 100 were the documents at issue and the legal determination had to be made by the judge. There wasn't anything more that could be done at settlement. I don't understand why all that was produced, even if it was going to be withheld under work product, why it was summaries and not the actual validation study itself. Because that was all that was in that office. We did identify everything that was in that office. But don't you have an obligation to go to your consultant and get the validation study itself and not just the summary of it? Not necessarily. Under FOIA, what the district court can do, and this court, is instruct the agency to release documents that are, one, improperly withheld, two, being withheld, in fact, and three, are agency records. Those are agency records. Wait a second. So it seems to me that, and I don't have a case on this, and maybe you have a case that doesn't say this, but it can't go. You're using the work product privilege as both a sword and a shield. You can't say that this was done at your request for purposes of litigation and withhold the documents on that basis and also say that these people who worked for you to prepare the study, you don't have an obligation to get the study and their records from them. I understand what Your Honor is saying. I think the jump that we've made here, and I certainly appreciate that counsel has a lot of experience in this area and has been involved in a lot of litigation and also himself was an air traffic controller, so he understands the process. But the great leap that's made is that because these kind of validation studies, which he describes as lengthy, over-100-page type documents, were done in the past, and he admitted during the hearing in the district court that the last one he saw was for 2013, that they should have been done in the current process. But I think what comes through in the declarations that we've submitted is that there was a change. As counsel referred to earlier, they were changing the process of how they hired air traffic controllers. And in the interim, while that was all ongoing, there was a need to hire. So they came up with a process in 2014 that may or may not have been complete, and then they amended it and came up with another process in 2015. So I'm not sure of when or if those kinds of studies described by counsel were done. All that being said, you produced summaries. Summaries of what? Summaries that were a request from AGC counsel to provide them information about the biographical assessment. And I don't mean to be evasive. I just don't want to volunteer what's in the records that have not been disclosed. Okay, but it really feels now like you're not only wanting to do the sword shield thing. Now it feels like you've got three different answers. One is I'm not sure the documents exist. Two is they're outsourced. And then the third is the work product problem. And I don't understand the government's position. Shirley, can you tell us whether the documents he's seeking, it's the underlying data from which the summaries were created. Do those exist? I do not know that those exist. It's a summary of something. Yes. It is a discussion of what's been done by the agency, by APT Metrics. I find this response concerning. I find it very concerning. This is a FOIA request. This is about public disclosure. The government should know whether the documents exist. That's my first comment. I guess it's not a question, but it's really concerning to me. I understand. The second is whether you're responding on a legal basis that you think, and that would be different, that your search doesn't need to include what your contractors have done, although our consultants have done, although I share, I think, the view Judge Wardlaw is expressing, that I don't think that works for you. And then there's the work product argument. And it seemed to me you have a real dog in the fight on the work product level. But his response to that is that the chronology doesn't line up. So just for my notes, only speaking for myself, it would be helpful for me to hear why you think the work product privilege applies. Well, because as set forth in the declarations, there was notice as early as 2013, I think it says 2014, in March of 2014, a class EEO complaint was being filed. So he's asking for documents concerning the 2015 assessment or BA. That's the one he took. Yes. That's the one he took, right. Right. And we originally sought documents for 2014. That was wrong. We corrected it. We did another search. We came up with what was relevant to 2015. Okay. So even if we agree with counsel that some validation must have been done before that. Because there are summaries of something. Because there are summaries of work that was done by APT Metrics. Correct. Yes. That even if they were done before, there was notice in early March that there was litigation ongoing. So those summaries or any validation that might have been done beforehand was already ongoing. How do we know that if we don't know, you just said a minute ago, you don't know if the underlying data exists and now your date's damping it for me? Well, if summaries are being, I'm going with the argument that the plaintiff's counsel raised, that these must have been done beforehand. So assuming that they were done beforehand, and I don't know that they were, we would have had notice that there was going to be litigation while that was going on. Right. But the litigation concerned people who were on the list. So they necessarily concern past biographical assessments, not the 2015 biographical assessment. But I think the issue in- If you had notice of some lawsuit, it had to be based on some action in the past, right? It was- Some alleged injury in the past, whether it was discrimination or invalid assessment or whatever. It couldn't be about the 2015. No, but I believe- So how are these covered by work product? Because the change to the biographical assessment precipitated all of that, all of the EEO complaints, and the FOIA requests here. Those changes started- I thought coming in today this was going to be an easy case. I'm not getting the answers I was expecting. I apologize. I am trying to answer to the best of my ability. But I will point out that because we went forward not believing that the search was an issue any longer, because had it been, we would have continued to work in the district court before briefing. That's certainly our policy, to continue to go back and forth about which documents are at issue. And we didn't see the issue arise until the- Maybe we should send you back to the district court. What did you think you were appealing? What did you think the issue was going to be? Because I'm having the same problem Judge Wardlaw is, which is now my notes are Kimball. The issue before this court, we believe, is whether the nine pages of documents are subject to the attorney work product privilege. Okay. And you think that's the limited legal issue we need to talk about, even though he's looking for the underlying data? Right. But I do think that counsel has raised the search issue. However, I'm trying to explain, if I can, to the court, why we don't have a lot of background information in the record, because we went forward on the belief that we were only arguing about these nine pages of documents. I see. Everyone was satisfied that this was the universe of documents at issue, and it was a simple legal determination. So the government thought that opposing counsel wasn't looking for the underlying data. Is that right? Well, yes. I think we thought that he was concerned about what we did find and was satisfied that that was everything that would be located, remember, in the AGC's headquarters office of 10 attorneys. Right. It's just that that has baked in the legal position, your position, that you don't have to look through your consultants' files. Well, those would not be agency records, but I certainly would have engaged in that process with him in the district court if the issue had arisen before the briefing on summary judgment. Okay. Thank you. Do your honors have any more questions? No, I've got some questions. I've been quiet here. But I'm not understanding the argument about summaries. The summaries of necessity have to summarize some empirical data. So if there was litigation, as you anticipate, I can understand the argument that the summaries might be protected, but why is the empirical data, the underlying data, why can't they get that? That doesn't say anything other than fact. Assuming that it exists, your honor, I think that as you say. Well, okay, let's not say as an assumption. Tell me why, if you're summarizing something, there isn't something to be summarized. I think that the summary, and I'd point out that the district court did look at these documents in camera, and I think that's. Wait, wait, wait. What documents? The summary? Nine pages of summary. Okay. Just the summaries, not the underlying data. Correct. So why didn't you produce the underlying data? I mean, the question is you have to do a reasonable search. And the answer you're giving is it's reasonable to look for summaries and ignore the underlying data. So that means anything you say is a reasonable search. No, I wouldn't say that we limited our search. We looked for anything, and if those documents had been located at AGC 100, they would have certainly been included. So forgive me for interrupting again, but when you said you didn't limit the search and we looked for anything, in response to Judge Malloy's question, you looked for within those ten attorneys within your in-house general counsel office, right? Correct. But that's the limitation. You only looked in-house. We looked in all four components. In-house? In-house at FAA. Okay. Three of which were not an issue, and the focus was these. Got it. Thank you. Okay, so now I have another sort of legal question. Can you distinguish for me Judge Souter's holding in the Klamath case, and then after the Klamath case, Judge Marshall decided your case, but following that, in 2017, Judge Moore at the Sixth Circuit decided that Lukasz case. So my question is, how is this, the organization, ATC or whatever it is, how is that a governmental agency? APT Metrics. Yes. In the context of the work product. No, I think Justice Souter said you've got to answer the first question. The plain reading of the language of the statute is it has to be a government agency. The cases cited in the brief and by the district court talk about the fact that it is perfectly reasonable for an agency to consult with an outside entity, and depending on what that type of work is, they can gain the protection as if they were a federal agency. So are you claiming that protection here, counsel? In terms of the work product, yes. All of it for the underlying data as well as the summaries? Yes. Okay. Lukasz says you don't get to do that, you don't get that argument. That's a Sixth Circuit case, I recognize that. But it says, nope, outside agencies are not governmental agencies. I understand. And so if the outside agency or company here, APT Metrics, has those documents, those would be documents that could be produced if they are similar to what's been produced in the past in validation studies, larger pieces of data than what we're talking about here. However, those records were not at AGC, and that was all we were focused on in the underlying court. Should we go back and check whether those documents exist elsewhere? That's something we would have taken care of in the district court and had a better record before this court. However, we all agreed that the issue was the nine documents. So we believed that what was really in Mr. Rojas's interest were these nine documents. I think that changed once we started arguing in the district court. Those nine documents that were reviewed by the district court judge are very clearly work product. It's a situation where counsel's office asked for something specific, and APT Metrics responded to them. I can't go into much more detail about what it is without disclosing the content of what's in those records. And that, under FOIA, is something we're not allowed to do. We are held to what the declarations say in terms of what the protections needed are. All right. Thank you. Thank you, counsel. Thank you, Your Honor. I'll give you a minute or so to respond. Well, one good thing about being a former air traffic controller is I can talk fast, but that's also a bad thing. So apologies ahead of time. Keep in mind, folks. Just don't mix up left and right. That's a very good point. I think the thing you have to focus on here is Mr. Ojas specifically asked for empirical data. He didn't ask for summaries in his FOIA request. The reason this AGC thing, legal counsel, came up, Mr. Ojas made his request with the FOIA coordinator. He didn't send it to AGC, the counsel's office. In the past, the FAA would farm out these requests to the other branches of the FAA that might have the data. In this case, it went to the general counsel's office who are now trying to use an attorney, client, or work product privilege, even though the FAA's past history and the way it's always done is you send the request to the different offices that may have the documents. They didn't do that. And now they're coming in trying to use a legal shield. You know, the Hemingway case states very clearly that an agency has to be careful not to read a request so strictly that the requester's denied information that the agency well knows exists. And I'd like to say one last thing, that the record, excerpts of record 79, 81, 92, 93, show we did not waive the adequacy of search issue. And Mr. Rojas' own request for the documents specifically asked for the empirical data. Counsel, the opposing counsel alluded to some discussions where she said that you narrowed the issues, that some of what you're addressing now are not within the scope of what you had narrowed in the district court. I distinctly heard her say that. We had talked, and counsel is correct, but what we had talked about, she said she had nine pages of documents. That's it, whether they're empirical studies or summaries, and I think she will attest to that. I have no way of knowing ahead of time whether they're going to be deemed to be summaries or anything else. We even argued in district court that if these are summaries, we want the actual empirical data. The FAA phrases them as summaries, and I do think this is kind of a thimble rig, a shell game. Again, how can you have a summary of empirical data and then come up here and allege that we don't know if the empirical data exists? Whether or not the categories, the nine pages are covered by work product, and I believe the Ritchie case controls and some other cases, but even if you rule that that does control, the issue about whether the underlying data should be given to Mr. Rojas, the empirical data, I can't see where that data used to validate a test would have any type of attorney-client or work product privilege because it has to be done to validate the test, was never decided in the district court. That's why summary judgment, among a lot of other issues and reasons, is improper in this case. All right. Anybody have questions? No. All right. Thank you, counsel. Rojas versus FAA is submitted, and this session of the court is adjourned for today. Thank you both.
judges: Wardlaw, Christen, Molloy